IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, ) ) ) | |
| Plaintiff, ) ) ) | |
| v. ) ) ) | Case No. 1:11-cv-795 (GBL/TRJ) |
| DARREN STOKES, ) ) ) | |
| Defendant. ) | |

## **MEMORANDUM OPINION AND ORDER**

THIS MATTER is before the Court on the Report and Recommendation of Magistrate Judge Thomas Rawles Jones, Jr. ("Report") (Doc. No. 23), regarding Plaintiff Associated General Contractors of America's ("AGC") Motion for Default Judgment against Defendant Darren Stokes ("Stokes"), and AGC's objections thereto (Doc. No. 24.). This case concerns trademark infringement claims by a trade association against an individual due to the individual's solicitation advertisements soliciting trade association members for listing in a directory. The issue before the Court is whether the Court should adopt the Magistrate Judge's recommendation that AGC's Motion for Default Judgment be denied with respect to its trademark infringement claim under 15 U.S.C. § 1114(1)(a) (2012), and its accompanying request for statutory damages. The Court adopts the Magistrate Judge's Report and Recommendation *in toto*. The Court overrules Plaintiff's objection and adopts the Magistrate Judge's recommendation as to AGC's trademark infringement claim because Stokes's advertisements contained marks that were distinguishable from AGC's marks, and thus did not amount to "counterfeit" under 15 U.S.C. § 1114(1)(a).

## BACKGROUND

Plaintiff AGC is a national trade association representing the general contracting and construction industry, incorporated in the District of Columbia and with its principal place of business in Arlington, Virginia. (Compl. ¶¶ 1, 6, Doc. No. 1.) AGC owns a number of registered trademarks (the "Marks") categorized as either "Typed Drawing" marks (now also called "standard character" marks) or "Design Plus Words, Letters, And/Or Numbers" marks. (Compl. Ex. 1.) Plaintiff's '718 Registration is a "Typed Drawing" mark of the initials "AGC," with no claim to a particular font style, size, or color. (Pl.'s Obj. to Report and Recommendation at 2, Ex. B, Doc. No. 24 [hereinafter "Pl.'s Obj."] (describing a "Typed Drawing" mark as a claim only to words, letters, numbers, or a combination thereof).) AGC's other Marks are design marks that include the initials "AGC" and "AGCA" and a circular logo. (Compl. Ex. 1.) The logo contains its full name and its initials "AGC," in which a large "A" is superimposed around the "G." (*Id.*)

Beginning in 2008, Defendant Stokes, a resident of the Commonwealth of Massachusetts, sent unsolicited advertisements by facsimile to AGC members promoting the sale of a membership directory referred to as "The American General Contractors Directory." (Compl. ¶ 13, Ex. 3.) The advertisement instructed AGC members to send a payment to its "membership processing department" in Stoughton, Massachusetts, and listed its corporate headquarters in Boston, Massachusetts. (*Id.*) Stokes sent this advertisement dozens of times to AGC members in multiple states. (Compl. ¶ 13.) On November 7, 2008, AGC issued a written notice to Stokes, requesting he discontinue the advertisements and any other materials using "The American General Contractors Directory," or any other name similar to AGC's Marks. (Compl. ¶ 15, Ex. 4.) Stokes responded on November 14, 2008, agreeing to cease his solicitations using "The

American General Contractors Directory," or "any other designation that is confusingly similar to one or more of [AGC's] Marks." (Compl. ¶ 15, Ex. 5.)

As early as January 6, 2009, Stokes circulated a second version of advertisements via fax to AGC members, despite AGC's request. (Compl. ¶ 15, Ex. 4, Ex. 7.) An AGC member in Kentucky received this second advertisement, purportedly from the "National Association of General Contractors & Home Builders," soliciting payment for listing in a directory, without giving a name for that directory. (*Id.*) The advertisement directed the recipient to send payment to "General Contractors & Home Builders," and provided the web address www.generalcontractorshomebuilders.org. (*Id.*) This AGC member mailed a $150.00 payment to the same "membership processing department" address listed in the first advertisement. (*Id.*)

Stokes then sent a third version of his solicitation to AGC members in multiple states, including Virginia, in March 2009. (Compl. ¶ 16.) This version advertised "The American General Construction Directory" under the corporate name "National Association for General Contractors & Home Builders, Inc." (Compl. ¶ 16, Ex. 6.) The advertisement directed the AGC member to make payment to "N.A.G.C." and listed the corresponding the web address to be www.generalcontractorshomebuilders.org. (Compl. Ex. 6.) Like the previous two versions, the third advertisement listed its "membership processing department" and "corporate headquarters" in Stoughton, Massachusetts and Boston, Massachusetts, respectively. (*Id.*)

On May 6, 2009, AGC, again through written notice, demanded Stokes cease disseminating materials with marks confusingly similar to AGC's Marks, and further warning that AGC would pursue legal action if Stokes refused to comply with this request. (Compl. Ex. 7.) Notwithstanding this second warning, Stokes circulated a fourth version of his solicitation for membership in the "American General Construction Association" from November 2010 until

3

at least June 2011. (Compl. ¶ 11, Ex. 2.) The fourth version of Stokes's advertisement prominently displayed the initials "A.G.C." next to a circular logo and instructed the recipient to send payment to the "AGC Association" membership processing department in Brockton, Massachusetts. (Compl. Ex. 2.) The circular logo contained a picture of a worker in the center with a garland below him. (*Id.*) The advertisement also listed a corporate headquarters address as 1655 North Fort Myer Drive in Arlington, Virginia, a location approximately one mile from Plaintiff's headquarters. (Compl. ¶ 12, Ex. 2.) Stokes sent the fourth advertisement dozens of times to AGC members in multiple states, including at least one AGC member in Virginia. (Compl. ¶ 11.) As a result of Stokes's advertisements, AGC members have sent payments to Stokes on numerous occasions. (Compl. ¶ 21, Ex. 7.)

On July 27, 2011, AGC filed a complaint against Stokes alleging counterfeiting of federal trademark registrations, trademark infringement and unfair competition, false or misleading advertising, and common law fraud. (Compl. ¶¶ 24-35.) Despite an extended period for service and published notice in *The Washington Post*, Defendant failed to respond in any way to AGC's Complaint or Summons. (*See* Doc. Nos. 6, 19, 13.) The Clerk of Court entered default judgment against Stokes on February 2, 2012, and the Court requested briefing from AGC on the issue of default judgment. (Doc. No. 15.) AGC submitted a Motion for Default Judgment on March 22, 2012, seeking injunctive relief, statutory damages, and attorneys' fees. (Pl.'s Mot. for Default J. at 1, Doc. No. 19.) AGC alleged that Stokes's advertisements contained "colorable imitations" of AGC's Marks that led to actual confusion by AGC members, and thus infringed on AGC's federally registered trademark. (*Id.* at 7-8.) Moreover, AGC contended that Stokes's advertisements depicted "spurious marks that [are] substantially indistinguishable from the "AGC" Mark, thereby using a counterfeit mark in violation of § 1114(1)(a). (*Id.* at 8.)

4

In his Report and Recommendation dated November 20, 2012, the Magistrate Judge recommended default judgment be entered in Plaintiff's favor against Defendant in all respects except the request for statutory damages pursuant to a trademark infringement claim under § 1114(1)(a). (Report and Recommendation at 1, Doc. No. 23.) The Magistrate Judge found that while Defendant's advertisements were "colorable imitations" of Plaintiff's marks, the use of a different organizational name and logo rendered the advertisements sufficiently distinguishable to fall outside of the Lanham Act's definition of counterfeit. (*Id.* at 6-9.) Magistrate Judge Jones also awarded AGC's request for $23,593.60 in attorneys' fees and costs, assessing the reasonableness of Plaintiff's rate through the Fourth Circuit's modified *Laffey* matrix in *Grissom v. Mills Corp.*, 549 F.3d 313, 323 (4th Cir. 2008). (*Id.* at 15-18.) Plaintiff timely filed an objection to the Magistrate Judge's recommendation with respect to the claim that Stokes used a counterfeit mark in the fourth version of his advertisements. (Pl.'s Obj. at 1.)

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 72(b) provides that a magistrate judge may hear a dispositive motion, without the consent of the parties, and recommend the disposition of the matter to a district judge. Fed. R. Civ. P. 72(b). A party must serve any objections to the magistrate judge's recommendation within fourteen days of being served with a copy of the order. *Id.* The district judge to whom a case is assigned shall make a *de novo* determination of those portions of the Magistrate Judge's Report to which objection is made. 28 U.S.C. § 636(b)(1) (2009).

## ANALYSIS

The Court adopts Magistrate Judge Jones's Report and Recommendation and grants in part Plaintiff's Motion for Default Judgment. The Court overrules Plaintiff's objection and

adopts the Magistrate Judge's recommendation as to Plaintiff's trademark infringement claim because Defendant's use of a distinct company name and logo rendered his marks substantially distinguishable from Plaintiff's registered "AGC" mark.

Under § 32(1) of the Lanham Act, it is unlawful for any person, without the consent of the registrant, to

> use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114(1)(a). To state a claim for counterfeiting, a plaintiff must show that (1) the defendant intentionally used a counterfeit mark in commerce; (2) the defendant knew that the mark was counterfeit; (3) the use occurred in connection with the sale, offering for sale, or distribution of goods, and (4) the use of the counterfeit mark was likely to confuse consumers. *Match.Com, L.L.C. v. Fiesta Catering Int'l, Inc.*, No. 1:12cv363, 2013 WL 428056, at *6 (E.D. Va. Jan. 31, 2013). The Lanham Act defines a counterfeit mark as "a spurious mark which is identical with, or substantially indistinguishable from, [the plaintiff's] mark." 15 U.S.C. § 1127 (2012); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 269 (4th Cir. 2007). Where a party produces counterfeit goods, there is a presumption of likelihood of confusion and plaintiffs are entitled to statutory damages. *See* 15 U.S.C. § 1117(b)-(c) (2012); *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987).

In analyzing whether a mark is counterfeit, a court does not "indulge in a prolonged and minute comparison of the conflicting marks in the peace and quiet of judicial chambers, for that is not the context in which purchasers are faced with the marks." *CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 267 (4th Cir. 2006) (quoting 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:58 (4th ed. 2005)). Rather, the marks must be

viewed in the light of "how the two parties actually use their marks in the marketplace to determine whether the defendant's use is likely to cause confusion." *Id.*

The Fourth Circuit has yet to conclusively establish whether the presence of a non-counterfeit mark near a counterfeit mark has any bearing, as a matter of law, on whether an item as a whole may be considered "counterfeit" under § 1114(1)(a). *See United States v. Lam*, 677 F.3d 190, 199 (4th Cir. 2012) (concluding it was for the jury to decide whether to consider the non-counterfeit mark in its determination that the defendant's plaid print was a counterfeit of a registered Burberry Check mark). The Fourth Circuit has explained that a counterfeit mark does not have to be an exact replica, for that "would allow counterfeiters to escape liability by modifying the registered trademarks of their honest competitors in trivial ways." *Id.* Still, whether a mark is counterfeit under the Lanham Act is a higher bar than a mere "colorable imitation," and must be more than simply reminiscent of a registered trademark. *See Colgate-Palmolive Co. v. J.M.D. All-Star Import and Export, Inc.*, 486 F. Supp. 2d 286, 289 (S.D.N.Y. 2007) (citing 130 Cong. Rec. H12076, H21078 (daily ed. Oct. 10, 1983) (Joint Statement on 1984 trademark counterfeiting legislation) (explaining that the sponsors did not intend to treat as counterfeiting what would formerly have been arguable, but not clear cut, cases of trademark infringement)).

In the Fourth Circuit, the likelihood of confusion is the critical inquiry in the counterfeit analysis. *Polo Fashions*, 816 F.2d at 148. In *Polo Fashions*, the defendant used a nearly exact copy of Polo's embroidered polo player on the breast of knitted sport shirts, the same manner in which Polo uses its registered logo. *Id.* at 147. The defendant contended that its shirts were distinguishable from Polo's because of the presence of a label inside the back of each shirt bearing the words "Knight of Armor." *Id.* at 148. The court found that there would still be a

likelihood of confusion, however, because a purchaser seeing the label might presume that Polo simply adopted another trademark. *Id.* Moreover, anyone seeing a person wearing the shirt would not see the distinguishable label at all. *Id.* Because the shirts were nearly identical and could not be distinguished by a label that was inside the shirt and generally not observable, the Fourth Circuit upheld the district court's entry of summary judgment for Polo. *Id.* at 148-49.

Marks that resemble a registered trademark but differ by a couple of letters have been considered distinguishable enough to fall outside the Lanham Act's definition of counterfeit. *Montres Rolex, S.A. v. Snyder*, 718 F.2d 524, 532 (2d Cir. 1983). For example, in *Colgate-Palmolive*, the defendant's box of toothpaste displayed the name "Colddate" in similar font and coloring as the plaintiff's registered "Colgate" mark. 486 F. Supp. 2d at 288. The defendant's box also displayed a blue globe with the phrase "Cavity Fighter," whereas Colgate's toothpaste box depicted a blue ribbon swirl design with the phrase "Cavity Protection." *Id.* The Second Circuit found that while defendant's toothpaste box was similar to the plaintiff's, an ordinary consumer would not perceive "Colddate" as actually belonging to Colgate, particularly when the largest graphical element on the box was different. *Id.* at 291. Thus, the boxes were sufficiently distinguishable to grant defendant's motion for summary judgment as to plaintiff's claim for counterfeit under § 1114(1)(a).

Similarly, marks that contain distinct names and divergent design patterns have been found to fall short of the Lanham Act's definition of counterfeit. In *Louis Vuitton*, a dog toy manufacturer sold a line of products under the name "Chewy Vuiton" and a monogram design "CV," which Louis Vuitton argued was substantially indistinguishable from its "Louis Vuitton" and "LV" marks for designer handbags. *Louis Vuitton*, 507 F.3d at 257-59. The Fourth Circuit found that while the defendant's dog toy products were similar and unmistakably derived from

8

Louis Vuitton's marks, the differing letters and designs were distinguishable such that an average purchaser would not confuse the marks for Louis Vuitton's. *Id.* at 269 (citing *Louis Vuitton Malletier, S.A. v. Haute Diggity Dog, LLC*, 464 F. Supp. 495, 506 (E.D. Va. 2006)).

Plaintiff argues that Stokes's fourth advertisement that displayed the initials "A.G.C." was a counterfeit of its "typed drawing" "AGC" mark, despite the distinct organizational name and logo adjacent to the mark. (Pl.'s Obj. at 2-3.) While Stokes may have used the same initials that Plaintiff registered in its "typed drawing" mark, the entire advertisement cannot be held counterfeit when viewed in conjunction with the remainder of the advertisement from the perspective of the average reader. *See Carefirst*, 434 F.3d at 267. Plaintiff correctly points out that *Carefirst* was a trademark infringement case, and not a counterfeit case. (Pl.'s Obj. at 5.) Even so, a finding of counterfeit is a higher threshold than a finding of a "colorable imitation" in a traditional trademark infringement case. *See Montres Rolex*, 718 F.2d at 528 (noting the distinction between the two causes of action, which is manifested in harsher consequences for counterfeiters). As such, relying on the contested document as a whole is appropriate to give meaning to the higher bar to relief for counterfeiting under § 1114(1)(a).[1] An average consumer receiving Stokes's advertisement or a similar solicitation from AGC would likely be unaware that AGC had registered such a mark, and would not view the initials as the document's sole

---

[1] The Court does not adopt or reject the "antidissection" rule argued by the appellants in *Lam*. *See Lam*, 677 F.3d at 198 n.7. As the Fourth Circuit noted, neither the Fourth Circuit nor the Supreme Court has invoked the rule. *Id.* Furthermore, the "antidissection" rule instructs that "[c]onflicting composite marks are to be compared by looking at them as a whole, rather than breaking the marks into their component parts for comparison." J. Thomas McCarthy, 4 *McCarthy on Trademarks and Unfair Competition* § 23.41 (4th ed. 2011). At issue in this case is not the dissection of composite marks into various components, but rather whether an entire document may fairly be considered counterfeit because of the presence of one counterfeit mark. The Court's decision only adopts the position that the entire document must be viewed as a whole to determine the likelihood of confusion that would actually ensue in the marketplace from the perspective of an ordinary viewer.

9

source of legitimacy. *See Fossil Inc. v. Fossil Grp.*, 49 U.S.P.Q.2d 1451, 1998 WL 962201, at *5 (T.T.A.B. June 6, 1994) (noting that marks must be compared in their entireties, but it is not improper to give more weight to one feature of a mark if such feature is more prominent than the other features). Thus, following *Carefirst*, the Magistrate Judge correctly recommended that the Court view the advertisement in its entirety to determine whether it can fairly be considered a counterfeit of AGC's mark.

Stokes's advertisement, viewed in its entirety, is sufficiently distinguishable from AGC's marks for two reasons. First, the advertisement exhibited a distinct circular logo immediately adjacent to the "A.G.C." mark. (*See* Compl. Ex. 2.) The Court agrees that the use of the initials "A.G.C." is substantially indistinguishable from Plaintiff's "AGC" mark, despite Stokes's insertion of periods between the initials. *See Adventis, Inc. v. Consol. Prop. Holdings, Inc.*, No. 7:02-CV-00611, 2006 WL 1134129, at *6 (W.D. Va. Apr. 24, 2006) (noting that the addition of standard character marks simply for punctuation purposes, and not as a new design feature, "would generally not alter the commercial impression of the mark whose major feature is the words themselves"). However, viewing the allegedly offending documents as a whole, Defendant's accompanying logo bears significant stylistic and graphical differences from the mark used by AGC in similar documents. (Compl. Ex. 2, Ex. 7 at 7, 10.) In fact, the logo in Stokes's advertisement is similar to AGC's registered mark only in its circular shape, which is by no means a distinguishing feature through which AGC may claim protection. Moreover, the picture of the worker and the garland below is circumscribed by the name "American General Construction Association," which should put an average consumer on notice that the membership directory solicitation did not come from Associated General Contractors of America. *See Louis Vuitton*, 507 F.3d at 269 (noting that marks with distinct names cannot be

considered counterfeit).

Second, the advertisement displayed the name "American General Construction Association" right next to the "A.G.C." mark and circular logo. Even if the Court found that the "A.G.C." mark and circular logo was substantially indistinguishable from AGC's registered marks, the Court could not find that the document was counterfeit when it does not even purport to come from Associated General Contractors of America. Concededly, the name displayed in Stokes's advertisement is a permutation of AGC's organization name, but it is distinct enough to fall outside the Lanham Act's definition of "counterfeit." The distinguishing organization name in this advertisement is even stronger than in *Colgate*, for example, because entire words, rather than just a couple of letters, are different. 486 F. Supp. 2d at 291. *See also Montres Rolex*, 718 F.2d at 531 (opining that the name "Amazonas" as opposed to "Amazon" could cause confusion but it could not seriously be contended that the average consumer would have found them substantially indistinguishable, even in the same industry).

The evidence of likelihood of confusion that was present in *Polo Fashions* is inapposite here. The Fourth Circuit noted that anyone observing a purchaser wearing the counterfeit Polo shirt would not see the distinguishing inside label. *Polo Fashions*, 816 F.2d at 148. In contrast, any recipient of Stokes's advertisement would see both the different organization name and the logo at the outset. Furthermore, it may be reasonable for an average purchaser to believe that Polo had simply adopted another trademark in addition to Polo and Ralph Lauren, but it is not as reasonable for a member of AGC to think that its organization changed its entire name without notice. *See id.* While evidence of actual confusion by consumers is persuasive, it is not dispositive. *See Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 467 n.15 (4th Cir 1996) (noting that evidence of actual confusion may actually favor the defendant in an infringing case

when it is less than ten percent). That a few AGC members were confused out of the countless numbers who received solicitations from Stokes is not compelling enough to find the advertisements were counterfeit in light of the other factors to the contrary.

Plaintiff's reliance on *Lam* in its Objection is misplaced and thus unpersuasive. In *Lam*, defendants were convicted for trafficking counterfeited goods under 15 U.S.C. § 2320 (2012)[2] for selling handbags that displayed a plaid pattern and an equestrian knight similar to marks registered to Burberry Limited, a fashion designing company. 677 F.3d at 193. Burberry held separate registrations for its signature plaid pattern (the "Burberry Check mark") and for an equestrian knight (the "Burberry Equestrian mark"). *Id.* Lam's handbags displayed a plaid pattern that differed from Burberry's Check mark only in the color and shape of the boxes. *Id.* at 200. Furthermore, Lam's handbags included an equestrian knight that was not included in Burberry's Check mark. *Id.* The jury did not find the knight displayed on the handbags to be a counterfeit of the Burberry Equestrian mark because the two marks differed in significant respects. *Id.* at 195 n.6. Still, the district court determined that the jury was entitled to decide whether to consider the presence of the non-counterfeit knight in its deliberations regarding the Burberry Check mark. *Id.* at 196. After the jury returned a guilty verdict, the district court denied defendants' motion for acquittal, finding that the evidence was sufficient to sustain the verdict. *Id.* at 197. Thus, the Fourth Circuit was only charged with deciding whether the evidence presented to the jury was sufficient to find that Lam's imitation handbags could be considered "counterfeit." *Id.* at 200. In affirming the lower court's refusal to set aside the verdict, because the evidence presented was sufficient to support the jury's finding of a

---

[2] While Lam was criminally charged for counterfeiting and AGC pursued a civil action, the definitions of counterfeit under § 2320 and § 1127 use the same general language. *See* 130 Cong. Rec. 31, 675 (1984) (confirming that the criminal and civil standards are "identical in substance").

12

counterfeit, the Fourth Circuit did not hold, as a matter of law, that the government's theory would be applicable in all cases. *Id.* at 198-99 (upholding a jury verdict if a reasonable finder of fact could accept the evidence as sufficient). Rather, the Fourth Circuit merely rejected Lam's contention that "as a matter of law,[] no rational jury could conclude that [Lam's] mark was a counterfeit. *Id.* at 200. Considering different procedural posture of this case, the Court cannot extend *Lam* to require that, as a matter of law, all marks comprised of counterfeit and non-counterfeit elements must always be found to be counterfeit. Accordingly, the Court does not broaden *Lam*'s holding to find that other mitigating factors in the advertisement cannot be considered by a fact-finder on a *de novo* review.[3] Therefore, because an average reader would not find Stokes's advertisement "substantially indistinguishable" from Plaintiff's registered marks, the advertisement was not a counterfeit under 15 U.S.C. § 1114(1)(a). Because the Magistrate Judge properly determined that Stokes's advertisements were not counterfeit, AGC is not entitled to statutory damages under 15 U.S.C. §1117(b)-(c). Thus, the Court adopts the Magistrate Judge's recommendation to deny AGC's claim for statutory damages.

---

[3] Plaintiff also contends that Magistrate Judge Jones was required to accept its allegation in the Complaint that Defendant used "spurious marks that are substantially indistinguishable from AGC's marks," because all well-pled factual allegations in a default judgment are deemed admitted. *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (citing *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). This argument is without merit. While the allegation was separate from its actual claim for relief, it is still a legal conclusion that the Court need not take as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (noting that courts "are not bound to accept as true a legal conclusion couched as a factual allegation")).

## CONCLUSION

Upon consideration of the November 20, 2012, Report and Recommendation of the United States Magistrate Judge designated to hear this matter, and upon an independent review of the record, the Court adopts Magistrate Judge Jones's Report and Recommendation (Doc. No. 23) *in toto*. Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Default Judgment (Doc. No. 19) is **GRANTED in part**;

**IT IS FURTHER ORDERED** that default judgment be **ENTERED** in favor of Plaintiff Associated General Contractors of America and against Defendant Darren Stokes;

**IT IS FURTHER ORDERED** that Defendant Darren Stokes be **ENJOINED** from further infringing upon Plaintiff Associated General Contractors of America's '718 Registration;

**IT IS FURTHER ORDERED** that Defendant destroy, or deliver to Plaintiff, all advertisements infringing on Plaintiff's marks or that make false or misleading representation of fact;

**IT IS FURTHER ORDERED** that judgment be entered in favor of Plaintiff Associated General Contractors of America and against Defendant Darren Stokes in the amount of twenty-one thousand two hundred seventy-five dollars and ten cents ($21,275.10), itemized as follows: (1) nineteen thousand three hundred ninety-two dollars and fifty cents ($19,392.50) for attorneys' fees; and (2) one thousand eight hundred eighty-two dollars and sixty cents ($1,882.60) for costs;

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Default Judgment is **DENIED** in part to the extent Plaintiff requests statutory damages pursuant to 15 U.S.C. §§ 1117 (b)-(c);

**IT IS FURTHER ORDERED** that Plaintiff's Objection to the Report and Recommendation (Doc. No. 24) is **OVERRULED.**

The Clerk is directed to forward a copy of this Order to counsel.

**IT IS SO ORDERED.**

ENTERED this \_\_\_\_ day of March, 2013.

Alexandria, Virginia
3 /\_\_ / 2013

/s/
Gerald Bruce Lee
United States District Judge